Antonione SMITH, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–1169.

District of Columbia Court of Appeals.

Argued Dec. 10, 2009.

Decided Jan. 14, 2010.

Craig N. Moore, appointed by the court, for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney, and Roy W. McLeese III, John P. Mannarino, and Suzanne Clement Libby, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and FERREN and STEADMAN, Senior Judges.

FERREN, Senior Judge:

In the movie "Up in the Air," George Clooney "plays Ryan Bingham, a corporate downsizer[,] ... a smooth talker

who can make you hear 'Yes' even when he's clearly saying 'No.' " Ann Hornaday, *First–Class Ticket*, THE WASHINGTON POST, Dec. 4, 2009, at C1.

Appellant Antonione Smith challenges his convictions for carrying a pistol without a license,[1] possession of a firearm by a previously convicted felon,[2] and possession of marijuana,[3] contending that the trial court erred in denying his motion to suppress the evidence against him. He claims that the police seized the unlawful firearm and illegal drugs from his pockets and shoe without probable cause for the arrest and search. We agree, reverse, and remand.

## I.

Metropolitan Police Officer James Kearney was patrolling the 900 block of Quincy Street, N.W., with his partner, Officer Jennifer Jamieson, when Kearney became suspicious of a man (later identified as appellant Smith) after appellant looked at the unmarked police car, made eye contact with Kearney, and, according to Kearney's testimony at the suppression hearing, "[i]mmediately shoved his hands in his pocket," then "rubbed his hand ... over his head two times, ... spat on the ground several times, and patted his right side." That reactive behavior, according to Kearney's training at the police academy, was known as a "felony rub."

Kearney therefore asked Smith if he could talk with him, and, according to Kearney's testimony, Smith "obliged." Kearney had noticed "a brown cigar hanging out of" Smith's pocket, "a common way to smoke marijuana," so he asked Smith whether "there was any marijuana in the ... cigar." Smith replied "no, looked down[,] and pushed it back into his pock-et." Not believing him, Kearney asked again (this time in the words of his grand jury testimony): "You're telling me that's not marijuana"? To which Smith replied, "yeah."

At the suppression hearing, Officer Kearney at first acknowledged that he had asked the question the second time exactly as he had formulated it before the grand jury. But he then backed off to say that the "grand jury testimony does not reflect the verbatim statement that I made on the scene that day either," and that he actually had asked the second time, "[W]as that marijuana in his pocket"[?] Then, revising his testimony once more, he testified that however he had asked the second question, he knew what he "was thinking" and took Smith's answer, "yeah," to mean "an admission that yes," he did have marijuana on him. Why so? asked the court. Replied Kearney: "I would say it was the body language and the way he said it, and the pause was kind of a—like a weight lifted off your chest when you admit something." Given Kearney's understanding of Smith's reply, the officer placed Smith under arrest. The government accordingly argues that Smith's "admission" supplied probable cause to arrest, and that the seizures of the unlawful drugs and gun were thus lawfully incident to that arrest.

## II.

The government stipulated at oral argument that Officer Kearney's grand jury testimony—his question in the negative and Smith's positive reply—should be accepted as true for purposes of this appeal. Nonetheless, argues the government, because Officer Kearney reasonably believed, on the basis of Smith's demeanor, that

1. D.C.Code § 22–4504(a) (2001).

2. D.C.Code § 22–4504(a)(2) (2001).

3. D.C.Code § 48–904.01(d) (2001).

"yeah" really meant yes to marijuana, this demeanor trumps the literal meaning of Smith's response. In short, the language of "no" under the circumstances meant "yes."

The trial court apparently accepted the defense position that Officer Kearney's grand jury testimony accurately stated his second question, and thus that Smith literally had replied that he did not have marijuana. Nonetheless, ruling for the government, the court found that Smith's "demeanor, [his] body demeanor" betrayed a different, legally damning response:

> I'm going to find that the officer's interpretation of the defendant's response was reasonable under the circumstances. In particular, I credit the officer's testimony based on *the demeanor, and the use of the words, and the totality of the circumstances*, the demeanor of the defendant, in responding in his statement, yeah, in response to the second question, which really is *a statement of resignation rather than one of denial, resignation that he did, in fact, have marijuana*, and that's based on my crediting the officer's testimony about the defendant's demeanor, *body demeanor*, as he described by example while giving his testimony, *what the defendant was doing when he said yeah*, and I agree with [government counsel] that in some circumstances, the literal answer given could be interpreted as a denial, but not the way it was given in this case. (Emphasis added.)

As noted, in order to turn Smith's negative reply into "yes"—into "a statement of resignation rather than one of denial"—the trial court relied on Smith's [1] "demeanor, and [2] the use of the words, and [3] the totality of the circumstances." As to *demeanor*, the court focused on "body demeanor"—on what Smith "was doing when he said yeah." Officer Kearney had described that demeanor as "the body language and the way he said it." That body language, more specifically, was a "pause," according to the officer; it "was kind of a—like a weight lifted off your chest when you admit something."

Next, *the use of words*. The words themselves, of course, cut against the government and the trial court's finding; thus, as the officer himself made clear, "the way" that Smith had said "yeah" supported the court's ruling, if at all, only as another kind of demeanor or body language. Apparently, therefore, the court understood "yeah" as "a statement of resignation" and affirmation, not rejection, based on Officer Kearney's characterization of the tone or manner of Smith's reply, sounding—as he testified at the hearing—like "more of a concession as opposed to . . . an agreeing that I don't [have marijuana]."

Finally, the *totality of the circumstances*. As we read the record, this catchall description has no content beyond the court's understanding of Smith's demeanor and words "when he said yeah." Neither the government nor the court refers back, for example, to the officers' initial observation of Smith doing a "felony rub" when he first saw the police heading toward him. And, to repeat: the words themselves cut entirely against the government's case and the trial court's findings. Thus, despite the court's three announced criteria (numbered above), this case shakes down to our deciding, in the court's words, whether Smith's "body demeanor"—what he "was doing when he said yeah"—was enough to transmute his literally negative reply into a "yes."

In reviewing the denial of a motion to suppress, we must defer to "the trial court's findings of fact as to the circumstances surrounding the [defendant's] encounter with the police and uphold them

unless they are clearly erroneous." *Shelton v. United States*, 929 A.2d 420, 423 (D.C.2007) (quoting *Prince v. United States*, 825 A.2d 928, 931 (D.C.2003)). On the other hand, we review the trial court's legal conclusions *de novo* and therefore must make an "independent determination of whether there ... was probable cause to arrest." *Id.*

We cannot say that demeanor or body language can never reverse the meaning of a suspect's literal statement to a police officer. But this is not such a case. On this record Smith's demeanor, his body language, was much too ambiguous, and thus too weak, to justify rejection of what Smith did say in favor of what he did not say, indeed in favor of exactly the opposite. Officer Kearney may have subjectively believed that Smith's "yeah," in answer to the second question, meant yes, he was carrying marijuana. But subjective belief is not the test. The trial court has to make findings based on what "an objectively reasonable police officer" would perceive under the circumstances. *Jefferson v. United States*, 906 A.2d 885, 887 (D.C. 2006) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003));[4] *see also Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Here, however, the body language on which the court relied was, at most, twofold: Smith's "pause" that "was kind of a—like a weight lifted off your chest when you admit something," and the manner in which he said "yeah," interpreted by Officer Kearney as "more of a con-

cession as opposed to ... an agreeing that I don't [have marijuana]." If mere references to a pause and a voice tone can turn no into yes, without further specifics by which a trial judge can document, with precision, why one's literal response must be rejected, then virtually nothing will stand in the way of accepting testimony by one party to a conversation who refutes an earlier statement by another party simply by saying that the other party did not mean what he or she actually said. The potential for mischief is obvious. In this case, for example, simply by knowing what he "was thinking" by asking a question in the negative, Officer Kearney allowed himself to believe that Smith's answer meant the opposite of what Smith literally replied. That will not do, absent powerful evidence that allows a reasonable finding of such contradiction. We have no such evidence here.

We therefore must conclude, under the circumstances, that the trial court clearly erred in finding that Officer Kearney reasonably, objectively believed that he heard a positive response from Smith to the officer's second question. Absent such reasonable belief, the officer lacked probable cause to arrest Smith and conduct a search incident to that arrest. We reverse and remand for further proceedings consistent with this opinion.

*So ordered.*

---

4. In *Pringle*, the Supreme Court elaborated:

The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized. * * * To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, *viewed from the standpoint of an objectively reasonable police officer*, amount to probable cause. (Emphasis added; internal quotation marks and citations omitted.)
540 U.S. at 371, 124 S.Ct. 795.